IN THE MATTER OF THE TRUST UNDER THE WILL OF
CAROLINE WELD FULLER.

Suffolk. January 6, 1994. - July 26, 1994.

Present: WILKINS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Trust*, Trustee's accounts, Charitable trust, Jurisdiction. *Attorney General.*
*Charity.*

In an action filed by the Attorney General pursuant to G. L. c. 12, § 8,
seeking the appointment of a temporary receiver to conserve the assets
and manage the affairs of a certain charitable trust, the Probate Court
maintained jurisdiction, under G. L. c. 206, § 1, to appoint new trust-
ees and to hold the former trustees, who had been appointed by the
court under the terms of a will, accountable to the court for their stew-
ardship of the trust assets, even though the former trustees had trans-
ferred the trust assets to a corporation for tax and other reasons benefi-
cial to the trust and in furtherance of it, and even though the Attorney
General had reached a settlement agreement with the former trustees
which had resulted in their resignation and their apparent payment to
the trust of $500,000. [482-485]

CIVIL ACTION commenced in the Suffolk Division of the
Probate and Family Court Department on August 18, 1992.

A motion to discharge a receiver and a petition to appoint
successor trustees were heard by *Elaine M. Moriarty*, J., and
questions of law were reported by her to the Appeals Court.
The Supreme Judicial Court granted a request for direct
review.

*Richard C. Allen*, Assistant Attorney General (*Johanna
Soris*, Assistant Attorney General, with him) for the Attor-
ney General.

*Stephen W. Howe*, guardian ad litem.

*Richard W. Renehan* for Jerome Preston, Jr.

*Erik Lund* for James C. Fullerton.

O'CONNOR, J. Caroline Weld Fuller's will was allowed in 1931. The residue of her estate was left to named trustees and their successors, who were directed to "hold, manage and invest the same" and, after the death of all persons to whom the testatrix had given life estates, "to expend the entire net income of said trust property . . . for the establishment and maintenance of . . . a small home in or near Boston or its suburbs to be known as the 'Haven' for . . . women." In addition, the testatrix gave "to said trustees, or to their successors in office for the time being under [the] will, the fullest discretion in establishing and maintaining economically such home . . . and the making of rules and regulations by which the same shall be governed, and by which the admission of women thereto shall be determined, and the power to change such rules and regulations in the discretion of said trustees." The will also provided that "[i]f, in the opinion of [the] trustees for the time being, it would be advantageous to incorporate the trust hereby created for the purposes above named, said trustees may form and maintain such a corporation, but they shall not at any time or under any circumstances merge or combine said home or corporation with any other institution." The will also provided that successor trustees would be nominated by the surviving trustee and appointed by the Probate Court and would give bond with corporate surety. Hereinafter, we shall refer to the testamentary trust as the Fuller testamentary trust.

In 1933, the trustees incorporated the Fuller testamentary trust as Fuller Trust, Inc. The by-laws of Fuller Trust, Inc., provide that the members of the corporation shall be the trustees of the Fuller testamentary trust and any other persons elected by the trustees. The board of directors is to be composed of the two trustees and one to three other persons. By 1948 approximately $2,000,000 in assets of the Fuller testamentary trust had been transferred to Fuller Trust, Inc., leaving $389.02 in the Fuller testamentary trust. Trustees' accounts were allowed for the period ending November 15, 1948. Further accounts were filed for the period from November 16, 1948, to May, 1961. Those accounts have not

been allowed. No accounts were thereafter filed until September 16, 1992, when, pursuant to court order, the trustees filed a final account for the Fuller testamentary trust from May 29, 1961, to August 17, 1979. That account showed a zero balance.

By April 5, 1979, Jerome Preston and James Fullerton had been appointed successor trustees of the Fuller testamentary trust. Each qualified by posting a surety company bond in the amount of $2,000. Fuller Trust, Inc., was managed by a board of directors controlled by Preston and Fullerton as trustees of the Fuller testamentary trust. Preston and Fullerton are also members, directors, and officers of Fuller Trust, Inc. Fuller Trust, Inc., established the Fuller Home, consisting of two residence houses with a capacity for twenty-two elderly residents located on approximately thirty acres of land in Milton. On February 8, 1988, a single justice of this court authorized Preston and Fullerton, as testamentary trustees, to deviate from the terms of the Fuller testamentary trust in order to build and operate a continuing care facility at the Fuller Home and to use both income and principal of the Fuller testamentary trust and Fuller Trust, Inc., for that purpose. Then, in 1989, Preston and Fullerton, trustees, established another not-for-profit corporation, Fuller Village, Inc., to implement the authorization granted by the single justice. Preston and Fullerton were the directors and officers of Fuller Village, Inc.

On August 6, 1992, Preston resigned as cotrustee of the Fuller testamentary trust, as a member, director and treasurer of Fuller Trust, Inc., and director and treasurer of Fuller Village, Inc. Preston's resignation as trustee was accepted by the court. Twelve days later, on August 18, the Attorney General filed a complaint in the Probate and Family Court seeking the appointment of a temporary receiver "to conserve the assets and otherwise manage the affairs of the charitable trust established by the will of Caroline Weld Fuller." The complaint made the following relevant allegations: "The purpose of the Fuller Trust is to provide housing for the elderly. The charitable purpose of the Fuller Trust is

carried out by two corporations, the Fuller Trust, Inc., and the Fuller Village, Inc. James C. Fullerton, the sole remaining trustee of the Fuller Trust, who is also the sole remaining board member of the Fuller Trust, Inc., and the Fuller Village, Inc., is tendering his resignations forthwith, and assents to the relief sought by the Attorney General in this Complaint. On August 6, 1992, this Court accepted the resignation of the other trustee of the Fuller Trust [Preston], who also resigned from all his positions with the Fuller Trust, Inc., and the Fuller Village, Inc. The Attorney General seeks the appointment of a Temporary Receiver to manage the charitable corporations pending the appointment of successor trustees."

On August 20, 1992, a judge of the Probate and Family Court conducted a hearing on the Attorney General's complaint seeking the appointment of a temporary receiver. At the hearing, the judge reports, "the Assistant Attorney General represented to the Court that the value of the charitable corporations had diminished from approximately 4.5 million dollars in 1989 to only $250,000.00 in 1992 and that the Attorney General wanted to have the remaining trustee's resignation accepted forthwith, as part of a settlement, pending nomination to the Court of suitable successors. Accordingly, the Attorney General requested the Court to appoint a temporary Receiver to conserve and manage assets of the charitable corporations. This reported diminution in value is not reflected in any pleadings. It was disclosed after the Court made inquiry of the value of assets in the charitable corporations in order to set the amount of the Receiver's bond."[1] On August 20, the judge accepted Fullerton's resignation as trustee of the Fuller testamentary trust subject, however, to an order that the trustees, Preston and Fullerton, file an account of the trust. Fullerton also resigned as president, mem-

---

[1]The judge's quoted statement is contained in a full and detailed memorandum entitled "Reservation and Report on Attorney General's Motion to Discharge Receiver and Petition to Appoint Successor Trustees." Our recitation of the procedural history and facts of this case are taken almost entirely from that memorandum.

ber, and director of Fuller Trust, Inc., and as president and director of Fuller Village, Inc. Presently, there are no trustees of the Fuller testamentary trust and no officers or directors of the two charitable corporations. Also, on August 20, the judge appointed the Attorney General's nominee as receiver, on his posting a surety company bond of $100,000, and directed him, among other things, to take charge of the assets of Fuller Trust, Inc., and Fuller Village, Inc., and file an inventory and report.

On September 16, 1992, pursuant to the judge's order, the trustees filed a final account for the Fuller testamentary trust covering May 29, 1961, to August 17, 1979, which, as we have noted above, showed a zero balance. The receiver also filed his report on September 16. He informed the court that, on September 11, 1992, the liquid assets of Fuller Trust, Inc., and Fuller Village, Inc., totalled $852,647, of which $500,000 represented payments by the resigned trustees "presumably," the judge's memorandum states, "pursuant to the undisclosed terms of the settlement" to which the assistant attorney general had referred on August 20. The receiver also reported that the two corporations owned personal property valued at $205,000 and thirty acres of land containing four structures of undetermined value. The receiver also reported that, in the three years preceding his report, the two corporations had incurred $3,700,000 in development expenditures in a failed attempt to establish the continuing care facility. In addition, $87,000 in accounts payable remained outstanding.

The judge denied the Attorney General's motion to discharge the receiver and she ordered the receiver to review the expenditures of Fuller Village, Inc., and report to the court. The judge also denied the Attorney General's request that she appoint successor trustees of the Fuller testamentary trust. In that connection, and for reasons carefully articulated in her accompanying memorandum to which we have referred in note 1, *supra*, the judge reserved and reported the case to the Appeals Court. In her reservation and report, the

judge asks the following six questions:

"(1) On the particular facts of this case, is this Court barred by the decision of *Attorney General* v. *Olson*, 346 Mass. 190 (1963) from seeking formal accounting of assets of the estate of Caroline Weld Fuller held in the charitable corporations merely because the purposes of the testamentary trust are implemented through the form of charitable corporations (controlled by the same Trustees) rather than the testamentary trust itself;

"(2) Can the resigned Trustees be made to account to the Court for their management and administration of Trust assets through the form of the charitable corporations, which assets have reportedly diminished by approximately four million dollars, when said corporations are 'mirror images' of the testamentary trust itself;

"(3) If the *Olson* decision does bar an accounting for these charitable corporations, can this Court require trustees to account for their management of charitable corporations and any reported diminution in value therein, because trustees are specifically authorized to expend funds from the corporation through a 1988 decision of the Supreme Judicial Court;

"(4) On the particular facts of this case, is this Court required under Massachusetts General Laws Chapter 203, section 5 to fill the vacancies in the trust under the will of Caroline Weld Fuller (Fuller Testamentary Trust) where, as here, there are no assets in the Fuller Testamentary Trust and if, as the trustees contend, there is no duty to account to this Court where there are no assets;

"(5) If the Court is required to fill trustee vacancies, may the Court require successor trustees to file surety company bonds, as directed by Testatrix, sufficient to bond them in an amount commensurate with the value

of assets in the charitable corporations, as opposed to assets in the Fuller Testamentary Trust, which are reportedly zero;

"(6) If the Court is required to fill the vacancies under the Fuller Testamentary Trust, and resigned Trustees are not obligated to account, may the Court decline to fill such vacancies until such time as [the] Receiver files a final report investigating circumstances of substantial diminution of almost four million dollars in Trust assets in three years."

The Attorney General moved for reconsideration of the decision to reserve and report the case. After the receiver filed his third report, which was critical of the trustees' performance, the judge concluded that "there are issues as to: [w]hether [the] Trustees acted in accordance with [the] appropriate standard of care and fiduciary principles; [w]hether there should be continued development of [the] project as planned and what other options are available; [w]hether, considering the magnitude of [the] financial diminution in Trust assets, a settlement of $500,000.00 is adequate and reasonable; [and] [w]hether Receivership expenses should be charged against Trust assets or [the] former Trustees." The judge concluded that the Probate and Family Court "has an independent obligation to review these matters [and] to protect the funds in the [Fuller testamentary trust], which have been significantly diminished while under [the] management of [the] resigned Trustees." The judge ordered that the order for reservation and report be stayed, and that Attorney Stephen W. Howe be appointed guardian ad litem "to review and report to [the] Court on the adequacy of the settlement and with authority to represent the Estate at any hearing on the merits of the settlement and any hearing on the Receiver's report."

The guardian ad litem filed two reports as a result of which the judge filed a new memorandum and order stating

in relevant part the following:

"In [his second] report the Guardian-*ad-litem* objects to the settlement as 'inadequate' on first examination, given the failure of the project, the magnitude of financial diminution of Trust liquid assets ($3.6 million dollars in three years) and [the] possibility of further financial recovery from [the] Trustees. The Guardian-*ad-litem* asserts [that the] Trustees did not act in accordance with appropriate standards of Massachusetts law and committed virtually all of [the] Trust's liquid assets to a 'speculative plan'. In addition, the Guardian-*ad-litem* asserts [that the] Trustees charged excessive fees ($1,354,841.00 in trustee and legal fees) and that [the] Trustees should bear the cost of receiver fees.

"The Attorney General and Trustees argue the settlement amount is reasonable.

"All parties, other than the Guardian-*ad-litem* have filed an assented to motion for entry of judgment asking that [the] probate accounts be accepted, no further accounting of the charitable trusts be required, successor trustees be appointed and [the] Receiver [be] discharged."

The judge continued:

"After review of [the] pleadings and argument and giving deference to [the] Attorney General's views as monitor of public charities, it appears to the Court that there remains a serious issue as to whether [the] Testatrix's assets were handled properly by the Trustees, and whether continuation of this project remains viable. A settlement of $500,000.00 on a loss of this magnitude, if the allegations of [the] Receiver and the Guardian-ad-litem are proven after a hearing, does not appear fair and reasonable.

"The threshhold issue herein remains jurisdiction. For the reasons set forth in its Reservation and Report, this Court believes it has jurisdiction and, in light of subsequent financial disclosure by the Trustees, should consider the issues raised by the Guardian-*ad-litem* at a hearing.

"If jurisdiction is before this Court, then this Court is charged with settling [the] Trustees' accounts; with examining whether [the] Trustees acted properly in implementing [the] Testatrix's wishes; with examining the nature and reason for this substantial financial loss incurred; and the reasonableness of any settlement.

"If jurisdiction is not in this Court, then the settlement may stand as approved by the Attorney General, and no further hearing is required. Any accounting of [the] Testatrix's assets would pass beyond this Court.

"Therefore, it is ordered:

"that the Order of February 9, 1993 which stays the Reservation and Report is vacated and the case is to be reported to the Appeals Court with the additional question;

"On [the] facts of this case, is this Court bound by any settlement agreed to by [the] Trustees and the Attorney General, or may the Court independently determine the fairness and reasonableness of the settlement?"

Thus, the reservation and report, as amended, presents a total of seven questions. We then granted the trustees' application for direct appellate review.

As the judge said, "For the reasons set forth in [her] Reservation and Report, [she] believes [the Probate and Family Court] has jurisdiction and . . . should consider the issues raised by the Guardian-*ad-litem* at a hearing." We return,

then, to the memorandum and order of reservation and report for a recitation of the very sound reasons given by the judge for her conclusion that the Probate and Family Court has jurisdiction to consider the issues raised by the guardian ad litem after a hearing. The judge reasoned as follows:

"Simply put, the issues herein are whether this Court, given the particular circumstances of this case, is barred from reviewing the resigned Trustees' management and administration of [the] trust assets, merely because said administration was done through the form of two charitable corporations, controlled by [the] trustees, rather than under the Testamentary Trust itself and whether this Court can require [the] trustees to provide any formal accounting of their management of the charitable corporations.

"If the Court cannot do so, is this Court being asked, in essence, to undertake a null and void act by appointing successor trustees under [the] Fuller Testamentary Trust, which has no assets, for the sole purpose of managing assets in the Fuller Charitable Corporations, when the Court cannot thereafter order an accounting from its own appointees.

"Had the assets herein continued to be administered through the Fuller Testamentary Trust itself, the law is clear that trustees owe a duty to account as court-appointed fiduciaries. M.G.L. ch. 206, § 1. [The] Trustees contend that from and after the date of [the] transfer of [the] assets to the charitable corporations in 1979 [the] Trustees had no further duty to account to this Court because the Trust, in effect, ceased. They held no property as trustees, and the corporations do not hold the assets as a trust.

"In support of their position, counsel for [the] resigned Trustees, Fullerton and Preston, rely heavily on *Attorney General v. Olson*. They contend that, as the

charitable corporations are a separate legal entity from the testamentary trust, there is no obligation to account for their actions in connection with these corporations. Since no assets [have] remain[ed] in [the] Fuller Testamentary Trust itself since 1979, (which information was not apparent until the account was filed by Court order on September 16, 1992) they are not obligated to file any further accounts of the testamentary trust beyond 1979 even though they remained in office. Instead, they initially offered the Court a letter from [the] trustees that no further assets had come into their possession in the testamentary trust since 1979. They ultimately did file an account of testamentary trust from 1979 to [the] date of resignation in 1992, showing a zero balance throughout so the issue of testamentary account is now moot. However, without such an accounting through [the] date of resignation there is no way the Court knows what has happened over the past thirteen years and whether other assets have come into the testamentary trust, nor does a new trustee have a starting point from which to file an inventory or account.

"The more serious issue in this case is the approximate four million dollar diminution in value suffered by the charitable corporations. [The] Trustees further contend that, because Fuller estate assets are administered through charitable corporations, the assets, in essence, pass beyond the jurisdiction of this Court and they are responsible only for filing annual reports to the Attorney General under Massachusetts General Laws Chapter 12, section 8F. The Attorney General indicates reports were, in fact, filed by the charities with that office. There is no indication to the Court as to how the Attorney General became involved in the case at present (e.g. whether by review of the reports or through other sources).

"*Attorney General v. Olson*, cited by [the] Trustees, bears similarity to the case at Bar. It is cited as authority [for the proposition] that filing reports with the Attorney General should be accepted in lieu of probate accounts to the Court, as the corporation does not hold the assets in trust but rather on a quasi trust. However, if, under the *Olson* decision, there is no duty to account to the court under any circumstances, and 'all technical trusts' have ceased upon transfer of [the] assets to the corporations, then it would seem to make no sense for this Court to appoint successor trustees of a testamentary trust which has ceased to function.

"[The] Trustees contend that distribution to the corporations is akin to distribution to a charitable legatee who is not required to account for use of the legacy. *American Institute of Architects v. Attorney General*, 332 Mass. 619 (1955). However, in that case, [the] executor makes distribution to a charitable corporation legatee and files his account and is discharged from office. The corporation did not continue to be operated by an estate fiduciary who remained in office for the purpose of discharging duties under [the] Testator's will.

"In the present case, the Attorney General and [the] Trustees' counsel have reached an agreement on [the] Trustees' resignation, on appointment of successor trustees and for transfer of assets to successor trustees without any further explanation to the Court as to diminution in value of [the] Testatrix's assets. The Court will have no opportunity to examine the nature and reason for any loss or the reasonableness of any settlement.

"This Court is now asked to make a finding that the nominated successor Trustees are suitable to be appointed; to require them to post a surety bond to this Court to qualify as Trustees of a Testamentary trust which has had no assets since 1979 and for which [the] trustees, under counsel's theory of the case, would have

no duties to discharge to the Court (It should be noted, however, the nominated trustees allege on the face of their petition that [the] purposes of the testamentary trust have not been accomplished). Such an appointment is a null act, which the Court ought not to be required to do.

"It appears from [the] terms of her will that [the] Testatrix's intent was to have continued Court supervision of her estate. To that end, while she authorized [the] trustees to incorporate, she required future trustees to be approved by the Suffolk Probate Court and required future trustees to post surety company bonds in connection with their administration. Her intent would effectively be circumvented if trustees, as fiduciaries, could avoid requirements of any accounting under any circumstances merely by incorporating her trust into a charitable corporation. Moreover, the amount of the surety company bond, if set based on assets in the testamentary trust, is inadequate security unless based on the value of assets actually held by [the] Trustees in the corporations. [The] Trustees herein are bonded for two thousand dollars while handling approximately four million dollars in assets. [The] Testatrix's directive for a surety company bond is effectively circumvented if any provision exempting [the] fiduciary of a charitable corporation from posting bond with surety is effective in these circumstances.

"I find, as the Assistant Attorney General acknowledges in oral argument, [that] these two charitable entities are 'mirror images' of the testamentary trust itself. The fact that they may be separate legal entities, at least in the circumstances of this particular case is a technical difference without substantive distinction.

"The total identity of trustees and corporate officers herein cannot simply be overlooked. While the entities are in a form of corporation, 'the corporation is simply a

means to enable the trustees to execute the trust with less difficulty. The control of the funds has been always and still continues to be with designated individuals in their private capacities clothed with a corporate being.' *Boston v. Curley*, 276 Mass. 549, 557 (1931).

"Title to Trust assets is in the name of the corporation (as opposed to [the] testamentary trust), through [the] Testatrix's authorization to incorporate [the] Trust; the management and use of these assets is to be as directed by her will, as modified by the Supreme Judicial Court's 1988 decision. As fiduciaries, [the] Trustees should, therefore, have a duty to account, if not annually under a bond, at least periodically, as directed by the Court.

"The Supreme Judicial Court observed about charitable corporations in *Boston v. Curley*,

'This is one of the instances where the corporation, although a separate entity for all purposes to facilitate the administration and execution of the trust, does not afford a shield to the managers in any of their trust responsibilities *to the Court* (emphasis added) or to the representative of public authority rightly acting toward enforcement of the trust. The Court will look through the corporate form in order to hold the individual members to the responsibilities and duties resting on trustees in their natural capabilities.' *Id.* 558.

"In addition, [the] Trustees are authorized to expend monies pursuant to an explicit order of the Supreme Judicial Court in 1988, which should make [the] Trustees['] actions subject to review either by the Supreme Judicial Court or this Court.

"Given that the Attorney General himself has brought the matter of the estate's administration to this

Court's attention by requesting immediate acceptance of [the] Trustees['] resignation before suitable successors could be proposed; given that the Attorney General has invoked the jurisdiction of this Court by requesting immediate appointment of a temporary Receiver to manage the charitable corporations; given that the Attorney General has orally disclosed to the Court that the liquid value of the charitable corporations had decreased from 4.5 million dollars to $352,000 in a brief three years (There has been an additional $500,000 reimbursed by [the] Trustees); this Court would be seriously remiss in its obligation to insure [that] the intent of [the] Testatrix's will is carried out, if it discharged the Receiver without requiring a report by him of the nature and benefit of corporate expenditures for the failed development project and if it did not require any formal accounting of the management of the charitable corporations by the testamentary Trustees. Moreover, such action would undermine the public's confidence in the Probate Court's discharge of its duties to oversee administration of trusts and estates. The reported diminution in value represents a very substantial loss to [the] Testatrix's Trust.

"Accordingly, while I find the nominated trustees would be suitable based on the Attorney General's uncontroverted representations in his memorandum . . . I decline to fill the vacancies under the will for the reasons stated herein. I find [that the] resigned Trustees should be obligated, on [the] facts of this particular case, to account for their management and expenditures through the charitable corporations and until such accounting is settled, no vacancy should be filled. Moreover, the Court, having been requested to appoint a Receiver, should not discharge the Receiver until [an] adequate gathering of relevant facts of this matter and a report to [the] Court is made. Accordingly, [the] mo-

tion to discharge [the] Receiver and for entry of final judgment is denied."

We turn now to brief summaries of the positions taken by the guardian ad litem, the Attorney General, and Preston and Fullerton, the former trustees. The guardian ad litem asserts that the trustees should be required to file with the Probate and Family Court the same reports that they have filed with the Attorney General since 1948 relative to Fuller Trust, Inc., and Fuller Village, Inc., that the court should not be bound by the Attorney General's acceptance of the reports filed with him nor by the Attorney General's settlement with the trustees, and that the Probate and Family Court "should have the authority to require the resigned trustees to furnish such additional accounting as it deems appropriate." Finally, the guardian ad litem concludes that the Probate and Family Court should appoint successor trustees and that the successor trustees should be required to "file surety company bonds in such amount as the Probate and Family Court deems sufficient."

In his brief filed with this court, the Attorney General concludes as follows:

"This court should answer the questions posed by the Probate Court as follows. *Questions 1, 2 and 3*: the court has jurisdiction to compel a further accounting and consider further financial recovery from the prior trustees. Such jurisdiction should be exercised, however, only if the trial court, after a hearing and consideration of potential defenses and of the potential costs to the charity and risks to the viability of the intended charitable purpose, makes a preliminary determination that further litigation is likely to result in additional liability of an amount that is sufficiently above the $500,000 obtained by the Attorney General to render such further litigation necessary to the furtherance of the charitable purpose. *Questions 4, 5 and 6*: the Probate Court should appoint successor trustees and may require them to

bond in an amount commensurate with the corporate assets. *Question 7*: The Attorney General's settlement does not bar the corporations, the receiver, or successor trustees from pursuing claims particular to them, but the trial court should not consider such claims in the absence of the preliminary determination referred to above."

The resigned trustees essentially assert a two-fold position; that the Probate and Family Court is bound by the Attorney General's settlement because the Attorney General's authority is exclusive in protecting the public interest in charitable funds, and that, in any event, there is no authority in the Probate and Family Court, derived from G. L. c. 206, § 1, or any other source, to compel the trustees to account for their activities as corporate directors of Fuller Trust, Inc., or Fuller Village, Inc. The trustees also contend that the Probate and Family Court should appoint successor trustees of the Fuller testamentary trust forthwith because, in the absence of successor trustees, Fuller Trust, Inc., and Fuller Village, Inc., cannot function.

For the reasons convincingly stated by the judge we agree with her view that, despite the settlement between the Attorney General and the Fuller testamentary trustees, the Probate and Family Court has jurisdiction to require the trustees, who were appointed by that court to carry out the testatrix's directives, to account to the court for their stewardship of the trust assets until their resignation, including the assets transferred to and held by Fuller Trust, Inc., and Fuller Village, Inc. General Laws c. 206, § 1, provides in relevant part that "a trustee required by law to give bond to a judge of probate [] shall render an account relative to the estate in his hands at least once a year and at such other times as shall be required by the court, until his trust is fulfilled." Caroline Weld Fuller's will directed that named trustees and their successors, such as Preston and Fullerton, should hold, manage, and invest the residue of her estate and, after the termination of certain life estates, to expend

the income for the establishment and the maintenance of a home for women. The will also provides that "[i]f, in the opinion of [the] trustees . . . it would be advantageous to incorporate the trust . . . for the purposes . . . named," the trustees, including successor trustees, would be authorized to form and maintain such a corporation. Pursuant to that authorization, the trustees formed and maintained Fuller Trust, Inc., and Fuller Village, Inc., in order to realize a perceived advantage in having corporate entities facilitate and promote the trustees' ongoing administration of the Fuller testamentary trust. Respect for the testatrix's clear intent that there should be continued court supervision of her estate through the successive appointment and monitoring of properly bonded trustees leads us to conclude that, in this case, the transfer of funds to the trustees' corporate agents, controlled by the trustees, to advance the trustees' task, but without completing it, did not result in the trust assets being separated from the trust for purposes of G. L. c. 206, § 1.

Within the fair meaning of the language of that statute, the trust assets after transfer to the corporations continued to constitute "estate in [the trustees'] hands" and, therefore, accounting to the court concerning those assets is required, as the statute provides, until the "trust [managed by the trustees through the corporations] is fulfilled." If, as the trustees argue, the appointment of successor trustees is critical to the ability of the corporations to function, and the corporations' ability to function is critical to the fulfillment of the testatrix's design, the corporations must be considered in the context of this case as the alter ego of the trustees. Accounting for all the trust assets, including those held by Fuller Trust, Inc., and Fuller Village, Inc., is required, and the Probate and Family Court has jurisdiction to hold the trustees accountable despite their settlement with the Attorney General. Although the Probate and Family Court may conclude that the intended beneficiaries of the Fuller testamentary trust would be better served by a decision not to seek further payments from the trustees, as the Attorney General suggests may be the case, only the Attorney General

— not the Probate and Family Court — is bound by the Attorney General's settlement.

We are confident that, in enacting G. L. c. 12, § 8 (1992 ed.), providing that "[t]he attorney general shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof," the Legislature did not intend effectively to deprive the Probate and Family Court of the traditional supervisory control, codified at G. L. c. 206, § 1, over trustees it has appointed, whenever, as here, the trustees have transferred the trust assets to a corporation for tax or other practical reasons beneficial to the trust and in furtherance of it. Thus, there is no constitutional impediment to the result we reach. Neither *Brigham* v. *Peter Bent Brigham Hosp.*, 134 F. 513 (1st Cir. 1904), *Ames* v. *Attorney Gen.*, 332 Mass. 246 (1955), nor *Lopez* v. *Medford Community Ctr., Inc.*, 384 Mass. 163 (1981), relied on by the trustees, is inconsistent with our holding. To the extent that this court's decision in *Attorney Gen.* v. *Olson*, 346 Mass. 190 (1963), would require a different result, we do not follow it.

We answer the questions contained in the reservation and report as follows:

1. "No."

2. "Yes."

3. "Not applicable."

4. "Yes, the Probate and Family Court is required to fill the vacancies. The trustees will have a duty to account to the court for the assets contained in the testamentary trust and the corporations."

5. "Yes."

6. "Not applicable."

7. "The Probate and Family Court is not bound by any settlement agreed to by the trustees and the Attorney General. The judge may independently determine the fairness and reasonableness of the settlement, may compel further accounting, and may consider further financial recovery from the trustees. However, the court should consider further financial recovery from the trustees only if, after consideration

of potential defenses and of the potential costs to the charity and risks to the viability of the intended charitable purpose, the judge concludes that further litigation, should it be necessary, will be likely to produce a recovery sufficiently above the $500,000 obtained by the Attorney General to render such further litigation appropriate to the furtherance of the charitable purpose."