IN THE MATTER OF THE TRUSTS UNDER THE
WILL OF LOTTA M. CRABTREE
(and a consolidated case).

Suffolk. May 9, 2003. - September 16, 2003.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Devise and Legacy,* Charitable trust. *Trust,* Charitable trust, Trustee's compensation. *Probate Court,* Guardian ad litem. *Attorney General.*

This court remanded to a Probate and Family Court judge for further consideration his decision pursuant to S.J.C. Rule 1:07, as amended, 431 Mass. 1301 (2000), to deny the petition of certain trustees of a charitable trust, brought under G. L. c. 203, § 5, to appoint a particular named successor to a deceased trustee, where rule 1:07 explicitly excluded from its scope those trustee appointments "prayed for by name" in any petition seeking an appointment, and where the judge made no findings to support rejecting the nominee based on his unfitness or concerns about the nominating trustees' performance. [183-188]

This court concluded that a Probate and Family Court judge properly required trustees of a charitable trust to submit a sworn itemized time and expense statement pursuant to G. L. c. 206, § 3, to the extent that the judge harbored doubt as to the fair value of the trustees' services, or doubt whether they had carried out their fiduciary duties to effectuate the will of the settlor. [188-190]

In circumstances where the trustees of a charitable trust reported substantially greater fees in connection with one of the seven active trusts they administered than the others, a Probate and Family Court judge's appointment of a guardian ad litem to represent the interests of potential student charitable beneficiaries of the loan fund set up by the trust was properly within his statutory authority and his powers under the Probate and Family Court's rules, and the fact that the Attorney General had the opportunity to object to an account but failed to do so did not preclude the judge from exercising his authority. [190-193]

PETITIONS filed in the Suffolk Division of the Probate and Family Court Department on April 19, 2001.

After consolidation, motions for reconsideration were heard by *Jeremy A. Stahlin,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*James R. DeGiacomo* (*Judith K. Wyman* with him) for the guardian.

*J. Owen Todd* for the trustees.

MARSHALL, C.J. In these consolidated appeals, which we transferred to this court on our own motion, we consider, among other issues, the circumstances in which a judge in the Probate and Family Court may invoke S.J.C. Rule 1:07, as amended, 431 Mass. 1301 (2000), concerning fee-generating appointments by the court, when considering a petition to appoint a trustee of a charitable trust who is "prayed for by name" in the petition.[1] In this case, a will drawn early in the last century established several trusts and named three trustees, but contained no provision for the trustees' replacements. In 2000 one of the trustees died, and the two remaining trustees filed a petition to appoint a new trustee, identifying him by name in the petition. A judge in the Probate and Family Court concluded, in effect, that rule 1:07 mandated that he deny the petition and appoint instead the

---

[1]Supreme Judicial Court Rule 1:07 (2), as amended, as appearing in 430 Mass. 1315 (2000), provides, in pertinent part: "Every individual court making fee-generating appointments shall maintain a list of persons eligible for each type of appointment made by the court."

Supreme Judicial Court Rule 1:07 (3), as appearing in 430 Mass. 1315 (2000), provides in pertinent part: "Each court appointment shall be made from the list maintained pursuant to section (2) of this rule, except as otherwise provided in section (4). Appointments from the list shall be made successively, except that, if an appointment is not made in successive order, the judge (or other person) making the appointment shall provide a brief written statement of reasons for not following the order of the list. . . . A judge may direct that an appointment made successively from the list be entered administratively by the clerk, register, or recorder."

Supreme Judicial Court Rule 1:07 (5), as amended, 431 Mass. 1301 (2000), provides, in pertinent part: "All clerks, registers, and recorders, for trial and appellate courts, shall establish and maintain, currently indexed, as part of the public records of the court open during regular business hours to public inspection, an appointment docket with respect to the appointment by the court of each fee-generating appointment, excluding appointees compensated by [the Committee for Public Counsel Services]. The appointment dockets shall include the following: . . . (k) administrator, *trustee*, guardian, conservator, or receiver, *whose appointment was not prayed for by name in a petition*, pleading, or written motion . . . (l) . . . The appointment of an executor, administrator, trustee, guardian, conservator or receiver shall not be entered on the appointment docket except as required by section (5)(k)." (Emphasis added.)

person next listed on a list maintained by the Probate and Family Court pursuant to rule 1:07 (2).

We conclude that the trustees' petition was not subject to rule 1:07 and that the judge should not have rejected the proposed trustee solely in reliance on that rule. We remand that issue for further proceedings consistent with this opinion. We affirm two related orders entered by the judge concerning the submissions of sworn statements of services by the trustees and the appointment of a guardian ad litem.

1. *Background.* On September 25, 1924, Lotta M. Crabtree died, leaving a will establishing several charitable trusts, seven of which are still active. Her will identified three trustees to administer the trusts, but made no provision for their replacements. As vacancies occurred over the intervening decades, the remaining trustees petitioned the Probate Court for replacement appointments pursuant to G. L. c. 203, § 5, in each case naming a replacement trustee.[2] The two current trustees, Robert J. Naughton and Francis J. Harney (trustees), were both appointed in this manner, as was the most recent third trustee, Joseph F. Lyons, who died on July 5, 2000.[3]

Among the seven active trusts is the Lotta Agricultural Fund trust (loan fund trust), the purpose of which is to make interest-free loans "to such graduates of the Massachusetts Agricultural College, in Amherst, Massachusetts [now the University of Massachusetts], as have completed their course at said college and have received diplomas therefrom, and who desire to follow agricultural pursuits but are without means to enter upon the same." As loans are repaid, the repaid funds are to be reinvested in the loan fund trust for the same purpose. In the event that the loan fund trust's income cannot be used in its

---

[2]General Laws c. 203, § 5, provides, in pertinent part: "If a trustee under a written instrument declines, resigns, dies or is removed before the objects of the trust are accomplished and no adequate provision for filling the vacancy is made therein the supreme judicial court, the superior court or the probate court shall, after notice to all persons interested, appoint a new trustee to act solely or jointly with the others as the case may be."

[3]The record does not establish whether, since the death of the settlor in 1924, any of the trustees "prayed for by name" in a petition were rejected by a judge, although the trustees claim that the court "has always appointed the trustees' choice for successor."

entirety for loans to eligible graduates, Crabtree's will directs that the income be used "semi-annually to assist needy and meritorious students in completing their courses of study in said . . . [c]ollege."

The trustees are required by statute to file annual accounts with the Probate Court. See G. L. c. 206, § 1. In May, 2000, trustees Naughton, Harney, and Lyons filed their fifth accounts. The Attorney General, who had been notified pursuant to G. L. c. 12, § 8G, did not file an appearance, nor did he otherwise object to the allowance of the accounts. In connection with the accounts for six of the trusts, the trustees reported fees ranging from $636 to $2,163; for the loan fund trust the trustees reported fees of $138,498 for the year at issue, January 1, 1999, through December 31, 1999. On November 17, 2000, the judge allowed all but the loan fund trust accounts, which he "wished to review further."[4]

After the death of Lyons, the two remaining trustees filed the sixth and final accounts for the period of Lyons's service. These accounts covered approximately six months, from January 1, 2000, through July 5, 2000, the date of Lyons's death. As with the previous accounts, the Attorney General was notified, and again, did not file an objection to the allowance of the accounts.[5] As before, the trustees reported substantially greater fees in connection with the loan fund trust, this time in the amount of $68,661, whereas fees for the six other trusts ranged from $294 to $1,221. As the judge later noted, and the trustees do not dispute, the trustees paid themselves fees of more than $530,000 for the then most recent four years for which they filed accounts pertaining to all seven trusts.

As noted above, Crabtree's will provides that income of the

---

[4]In a written memorandum dated August 10, 2001, the judge stated that six of the seven accounts were allowed "[a]fter some further information was provided to the Court and the accounts of six of the trusts were amended accordingly . . . ." It is not clear when or in what respect the six accounts were amended.

[5]The docket of the Probate and Family Court reflects that much later, in September, 2002, the Attorney General did file an appearance. That portion of the docket was appropriately not included in the record, and there is no indication that the Attorney General expressed any views with respect to the issues on appeal here.

loan fund trust be used "semi-annually" to assist needy students. However, the judge found that the ending balance of funds in the loan fund trust, as reported in the sixth account, was $4,561,810 and that both the fifth and sixth accounts had "beginning income balances and ending income balances in excess of $300,000 despite an apparent requirement of the trust that all income be used semi-annually."

After reviewing the trustees' sixth accounts, on May 17, 2001, the judge issued fourteen orders, two for each trust directed to each trustee, ordering the trustees to file a sworn written statement (statement of services) in connection with both the fifth and sixth accounts of the trusts to include (1) a dated itemized record of all time spent for which compensation was paid; (2) a dated itemization of all expenses for which reimbursement was paid; (3) the total payment made to the trustee; and (4) a certification that the services listed were provided and that the services and time spent were necessary and within the scope of services which the trustee was appointed to perform.

Also on May 17, 2001, the judge appointed a guardian ad litem, Attorney James R. DeGiacomo, "to represent the interests of potential student charitable beneficiaries" of the loan fund trust in the then pending actions for allowance of the fifth and sixth accounts.[6] Accompanying the appointment of the guardian ad litem was a temporary order, in which the judge directed the guardian to review the trustees' compensation and to ascertain whether the trustees were using fund income, recording distributions and making investments in accordance with the terms of the Crabtree will.[7] On June 15, 2001, the trustees filed three

[6]The judge noted in a written memorandum that he could not determine whether the trustees had given notice of either the fifth or sixth accounts "to *all* persons to . . . whom income [was] paid . . . during the period covered by the account" (emphasis added). G. L. c. 206, § 24 (4).

[7]Specifically, the judge's order stated, inter alia, that: "The guardian ad litem's review of the trust and account shall include, but not be limited to: a. Trustee compensation, b. Whether all income is being used in accordance with the requirements of paragraph (10)(a) of the will, c. Whether distributions recorded in the accounts as 'Distributions, University of Massachusetts' are in accordance with the requirements of paragraph (10)(a) of the will, d. Whether

motions for reconsideration,[8] each of which the judge denied in a written memorandum dated August 10, 2001. The trustees appealed from the judge's orders and from his denial of their motions for reconsideration.[9]

Meanwhile, on April 19, 2001, the trustees had filed a petition for the appointment of "Francis L. Swift, or some other suitable person" to fill the vacancy occasioned by Lyons's death. The petition as filed consisted of a preprinted form, with the trustees submitting the information called for by that form.[10] At a brief hearing on the petition, during which Swift was present in the court room, the trustees informed the judge that the requisite bonds for Swift had been filed. See G. L. c. 205, § 1. The judge made no inquiry concerning Swift's qualifications. On November 30, 2001, the judge issued his ruling on the petition. He declined to appoint Swift as successor trustee and

investments made have been consistent with the provisions of paragraph (13) of the will."

[8]Individually, Harney and Naughton each sought reconsideration of the seven orders pertaining to the statement of their services. They also jointly sought reconsideration of the judge's order appointing the guardian ad litem.

[9]While the trustees' motions for reconsideration were pending, the trustees filed a petition for interlocutory relief, pursuant to G. L. c. 231, § 118, first par., which was denied. Sometime thereafter, on October 19, 2001, the guardian ad litem filed an interim report with the Probate and Family Court and moved for a speedy hearing on his motion for an order adopting his recommendations, pending appeal. On November 29, 2001, the judge granted the guardian ad litem's motion in part and issued a written memorandum of decision, noting that "[o]rdinarily, the motion . . . would have to be denied, as an appeal from the order appointing him is deemed to be a 'final' decree for purposes of appeal," but that in this case, the trustees were "estopped" from treating the order as final because they "chose to treat [it] . . . as an interlocutory order and petitioned for interlocutory relief pursuant to G. L. c. 231, § 118, first paragraph." The judge ordered "a hearing . . . for the trustees to show cause why they should not be held in civil contempt of court and removed from their positions of trust for failure to file statements as ordered on May 17, 2001, and for the trustees to be examined under oath on their accounts." On December 18, 2001, the trustees filed a notice of appeal from, among other things, the show cause order and the orders requiring the trustees to file statements pursuant to rule 1:07. The Probate and Family Court docket indicates that the parties filed and the judge allowed a motion captioned "Assented to Motion to Continue Civil Contempt Hearing." That motion is not part of the appellate record or these appeals.

[10]The form bears the notation "CJ-P 25," a notation consistent with the convention used by the Probate Court to identify its forms. The Rules of the Probate and Family Court (2001) identify "CJ-P 25" as "Reserved."

instead appointed Elizabeth F. Potter, the person next on the list maintained by the court pursuant to rule 1:07 (2).[11] The trustees also appeal from this ruling. The guardian ad litem opposes both appeals.[12]

2. *Appointment of the successor trustee.* We begin by reviewing the judge's November 30, 2001, decision denying the trustees' petition to appoint Swift as the successor trustee to Lyons, and appointing Potter from the list maintained by the Probate and Family Court pursuant to rule 1:07. Rejecting Swift, the judge stated: "Fee generating appointments made by a judge, including appointments of trustees, are subject to Supreme Judicial Court Rule 1:07." We infer from this that, in the judge's view, rule 1:07 governs every appointment of a trustee of a charitable trust whenever the trust instrument contains no provision for the replacement of trustees. See G. L. c. 203, § 5. But see note 21, *infra.* The judge noted that rule 1:07 had been amended in January, 1999, in the wake of a December, 1997, Report to the Justices by this court's Committee on Fee-Generating Appointments (Committee Report). The committee had been established in response to a finding by this court's Commission to Study Racial and Ethnic Bias in the Courts, "that the procedures for fee-generating appointments used by the courts do not provide equal opportunities for minority appointments." See Committee Report, *supra* at 1.[13] According to the judge, the charitable trusts under the Crabtree will, "with

---

[11]Pursuant to rule 1:07 (2), the lists are public; open to all qualified candidates without regard to race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status; and not restricted to a fixed number of candidates. S.J.C. Rule 1:07 (1), (2). The qualifications (professional, education, and other) for each type of appointment are stated in an annual report issued by the Chief Justice for Administration and Management. S.J.C. Rule 1:07 (1). See, e.g., Annual Report of Fee Generating Appointments Pursuant to Supreme Judicial Court Rule 1:07 for Fiscal Year 2004 at 22.

[12]In reviewing the guardian ad litem's motion for a speedy hearing, see note 9, *supra*, the judge in the Probate Court ruled that the guardian ad litem "could and may continue to carry out his duties, including participation in the pending appeals, with the understanding that compensation may not be available from the trust if his appointment were ultimately deemed to have been improper."

[13]In his decision, the judge quoted the concerns noted in the committee report as follows: "a member of the Mass. Association of Women Lawyers

large fee payments and trustee appointments in the discretion of the judge, are a quintessential example of the 'big money estate cases' with 'old boy network' potential that the amended Rule 1:07 was intended to address." While the judge correctly identified the source of the January, 1999, amendment to rule 1:07, and the concerns it was designed to correct, he misapprehended the applicable scope of our rule.

At first glance, the rule appears to have wide application. The rule's preamble is broad ("to assure that all fee-generating appointments made by the courts of the Commonwealth are made on a fair and impartial basis"), as is the directive contained in rule 1:07 (3) ("[e]ach court appointment shall be made from the list maintained pursuant to section [2] of this rule, except as otherwise provided in section [4]"). But when read as a whole, the rule does not contemplate that the terms "fee generating appointment" and "court appointment" apply to every trustee appointed by a judge pursuant to G. L. c. 203, § 5. These terms refer only to those appointments that must be recorded in the appointment docket pursuant to rule 1:07 (5).[14]

S.J.C. Rule 1:07 (5) (k) explicitly excludes from the appointment docket, and therefore from the scope of rule 1:07, those

---

[observed] that the more lucrative appointments are received by those in the 'old boy network' while the members of her association receive appointments in smaller domestic cases. This view was shared by James Dilday, President of the Mass. Bar Association, who stated that minority attorneys are excluded from the 'big money estate cases.' " Report of the Committee on Fee-Generating Appointments at 7 (Dec. 1997) (Committee Report). The judge had made the same reference in his August 10, 2001, order directing the trustees to file a statement of services pursuant to rule 1:07 (7). See Part 3, *infra.*

[14]The early versions of what became rule 1:07 apparently were promulgated to address a possible problem that certain judges were routinely making various fee-generating appointments to a small number of attorneys. To monitor and expose any such abuse, the rule established a system to record in one docket fee-generating appointments made by judges, which could be reviewed by the public. Consistent with the purpose of the rule at that time, trustees "prayed for by name" were not required to be recorded on that docket.

The January, 1999, amendments, on the other hand, were promulgated to address a different issue: the exclusion of women and minorities from those appointments. See Committee Report, *supra* at 1, 17. To this end, the January, 1999, amendments supplemented the rule with new provisions concerning pre-appointment and appointment procedures. The amendments did not broaden the scope of trustee appointments encompassed by the rule.

trustee appointments "prayed for by name" in any petition seeking appointment. See S.J.C. Rule 1:07 (5) (l) ("The appointment of [a] . . . trustee . . . shall not be entered on the appointment docket except as required by section [5] [k]"). Accord S.J.C. Rule 1:07 (1), as appearing in 403 Mass. 1303 (1989), superseded by S.J.C. Rule 1:07, as appearing in 430 Mass. 1315 (1999) (docket shall include only those trustees who are "a person other than the person, if any, whose appointment was prayed for in a petition, pleading, or written motion, or in cases in which such petition, pleading, or motion does not pray for the appointment of any specific person"). The import of rule 1:07 is that when a judge is required to exercise discretion to identify a new trustee (in other words when no trustee is "prayed for by name"),[15] the judge must exercise that discretion in an even-handed manner. See S.J.C. Rule 1:07, preamble (purpose of rule is "to assure that all fee-generating appointments made by the courts of the Commonwealth are made on a fair and impartial basis with equal opportunity and access for all qualified candidates for appointments," while avoiding "favoritism and the appearance of favoritism"). This is consistent with the obvious purpose of the committee and its report. See Committee Report, *supra* at 17 (recommendations "directed towards bringing to public light information on the types of appointments made by the courts and the qualifications needed to receive these appointments" and establishing "a regular process to provide public notice of these opportunities and a system to ensure equal opportunity for all those meeting established qualifications for appointment").

Our rule recognizes and endorses the long-held view that "[i]n naming a trustee to fill a vacancy where the instrument does not prescribe a method, the court has a wide discretionary range." *Wilson, petitioner*, 372 Mass. 325, 327 (1977). Notwithstanding such discretion, our rule reflects the view that "it would be folly for the judge not to pay attention to the judgment of the active trustees as to who their colleague should

---

[15]Rule 1:07 does not apply, of course, only to the appointment of trustees. A wide range of court appointments, including those explicitly listed in (a) through (k), as well as "any other fee-generating appointment not compensated by [the Committee for Public Counsel Services] and not otherwise excluded by this section," are governed by the rule. S.J.C. Rule 1:07 (5) (l).

be." *Id.* at 329. If every fee-generating appointment made by a judge, pursuant to G. L. c. 203, § 5, could be made only from the list of persons compiled pursuant to rule 1:07 (2), existing trustees could never exercise any "judgment" as to who their colleagues should be. Nothing in the committee's report, or the findings and recommendations of the commission to study racial and ethnic bias in the courts, on which the report relies, or the 1999 amendments to the rule, warrants that conclusion.[16]

Of course, a judge always retains the discretion to reject a nominee "prayed for by name" where the nominee is "justifiably found to be unsuitable" or there exist "facts strongly indicative of the necessity of a different appointment." *Lovejoy, petitioner*, 352 Mass. 660, 665 (1967).[17] But it is far from clear that the judge refused to appoint Swift on that basis. The judge did note that he knew "nothing of [Swift's] qualifications or suitability to serve," explaining that "[w]hen the instant petitions to fill the vacancies in the trust were presented to the Court at a hearing, the petitioners provided no information about their nominee, Mr. Swift, except his name and that he is of Osterville in the County of Barnstable." A judge is always free to examine the qualifications of a trustee "prayed for by name." But until the judge undertakes that examination, it would be difficult for the proponents to anticipate the need to

---

[16]Nor does the amended rule alter the requirement that the judge give "special consideration" to the views of the Attorney General. See *Wilson, petitioner*, 372 Mass. 325, 330 (1977). Rule 1:07 did not negate *Wilson, petitioner, supra*, or *Lovejoy, petitioner*, 352 Mass. 660, 665 (1967).

[17]Analogizing to *Lovejoy, petitioner, supra*, the trustees argue that it is reversible error for the judge to substitute his own judgment for that of the Attorney General who, they argue, implicitly assented to Swift's appointment by not filing an objection. See *id.* at 665 (where "the beneficiaries [had united] on a qualified trustee . . . [it was] arbitrary and capricious action and an abuse of discretion for the court to appoint a stranger"). Assuming, arguendo, that the Attorney General's silence here constituted assent, we have elsewhere rejected the crux of the trustees' argument. See *Wilson, petitioner, supra* at 329 (Attorney General's nominee not entitled to same deference as beneficiaries' nominee in *Lovejoy, petitioner, supra*, because, among other things, compatibility between beneficiaries of private trust and trustees was "highly important"). Cf. *Matter of the Trust under the Will of Fuller*, 418 Mass. 466, 483-484 (1994) (probate judge not bound by settlement reached between trustees and Attorney General).

establish the nominees' qualifications.[18] It is undisputed that Swift was available to testify at the hearing on the trustees' petition, but the judge made no inquiry concerning his qualifications. Had the judge harbored reservations concerning the qualifications of Swift, he should have made inquiry about those qualifications and given the trustees an opportunity to present them. As we shall explain, it may be that the reason for the judge's reservation about Swift had less to do with Swift's qualifications than the fact of his nomination by Naughton and Harney.

In rejecting Swift, the judge also noted that Swift's name did not "appear on the list of names" issued pursuant to rule 1:07. While the judge's statement may be nothing more than an explanation as to why in his view he could not appoint Swift, his statement suggests that a candidate not listed under rule 1:07 is not qualified to serve as a trustee appointed under G. L. c. 203, § 5. Any such inference is incorrect. Those who may seek appointment as trustees "by the court," i.e., when a judge himself must identify the trustee, must meet the qualifications established from time to time pursuant to rule 1:07. See note 11, *supra*. But there are surely countless trustees who now serve, and who will in the future be nominated to serve ("prayed for by name"), who will not apply to have their names placed on the rule 1:07 list. Among other reasons, such trustees may have no interest in serving as trustees for trusts with which they have no connection. Our rule was not intended as a Statewide licensing or qualification scheme for all trustees appointed under G. L. c. 203, § 5.

Although it was error to reject Swift because his name was not included on the rule 1:07 list, there may be other reasons for the judge to reject Swift. From his related order, which we address below, it may well be that the judge had valid concerns about the trustees' performance, such that their nomination of Swift alone was sufficient to disqualify him. If the judge were

---

[18]While there are specific qualifications for individuals seeking to be appointed by a judge from "the court list" maintained pursuant to rule 1:07, see note 11, *supra*, there is no analogous rule that would require similar qualifications of others. Here, the preprinted petitions submitted by Naughton and Harney did not prompt them to provide information concerning their candidate's qualifications. See R.M. Rodman, Procedural Forms § 1774 (5th ed. 1990).

to conclude that the current trustees have not carried out their fiduciary duties in accordance with the settlor's wishes or have paid themselves fees in excess of their entitlement as trustees, he would be acting well within his discretion to reject their nominee; their "judgment" would merit no consideration. Here, the judge made no findings to that effect, and we cannot conclude from the record whether such findings would be warranted.[19] We therefore remand this matter to the probate judge for further consideration of the trustees' petition.[20]

3. *Trustee statement of services.* We consider next the trustees' challenge to the order that they be required to provide a certified statement of their services. The judge initially explained that the trustees were fiduciaries whose names were required to be recorded in the appointment docket pursuant to rule 1:07 (5) and that they had been paid without prior approval as required by rule 1:07 (7). In his later, August 10, 2001, memorandum on the trustees' motion for rehearing, the judge elaborated. He acknowledged that "at first blush" the express terms of the rule seemingly excluded the trustees because Naughton and Harney had been "prayed for by name in a petition, pleading, or written motion," and were not "required" to be so recorded. S.J.C. Rule 1:07 (5) (k). Nevertheless, the judge reasoned, the purpose of that exclusion was "to excuse from some provisions of the rule those fiduciaries who were selected by true parties in interest rather than by a judge." As we explained earlier, rule 1:07 was not intended to apply to all appointments made pursuant to

[19]In the judge's separate memorandum concerning his decision to appoint a guardian ad litem, he stated that "questions [about the trustees' administration of the fund] . . . appear from the face of [the] account." It was "not clear" to the judge that all fund income had been used in accordance with the terms of the will and questioned both "the size of the fees paid by the trustees to themselves and the fact that both [the trustees' fifth and sixth] accounts have beginning income balances and ending income balances in excess of $300,000 despite an apparent requirement of the trust that all income be used semi-annually."

[20]If, on remand, the judge denies the trustees' petition to appoint Swift for reasons pertaining to the trustees' performance (i.e., if the judge concludes that the performance of the trustees is so questionable that any candidate of theirs would be suspect), it would be futile for the trustees to propose an alternate candidate. In such circumstances, the judge would be required to follow the procedures outlined in rule 1:07 to select and appoint a successor trustee.

G. L. c. 203, § 5, and the judge's view to the contrary is neither supported by the express terms of the rule nor required to give effect to our rule's intent.[21] That, however, does not end our inquiry.

The judge also ruled that even if rule 1:07 did not apply to Naughton and Harney, he would, in any event, have entered the same order against the trustees "in light of the fees reported in the . . . trust accounts." The judge had the full authority to do so. As the judge correctly recognized, he has broad statutory authority to supervise trustees, *Matter of the Trust Under the Will of Fuller*, 418 Mass. 466, 484 (1994) (Probate Court retains "traditional supervisory control codified at G. L. c. 206, § 1, over trustees it has appointed"),[22] and to examine them "under oath . . . upon any matters relative to [their] accounts." G. L. c. 206, § 3. To the extent that the judge harbored doubt as to the fair value of the trustees' services,[23] or doubt whether they had carried out their fiduciary duties to effectuate the will of the settlor, which he clearly did, it was entirely proper to require

---

[21]In the judge's August 10, 2001, memorandum directing the trustees to file sworn written statements, the judge suggested that the scope of rule 1:07 may have some limitations. Specifically, he concluded that the "prayed for by name" exclusion applied only where "the trust instrument specifies a method for successor trustees to be nominated; or the donor or the donor's family is still legally interested in the trust and entitled to notice; or beneficiaries specified by the trust instrument, or their issue or appointees as defined in the trust instrument, remain legally interested and entitled to notice." This conclusion reflected the judge's view that rule 1:07 was intended to apply where "fiduciaries . . . were selected by true parties in interest rather than by a judge." In both his August 10, 2001, memorandum and his November 30, 2001, decision refusing to appoint Swift, the judge's conclusions regarding the scope of rule 1:07 rested on a distinction he drew "between trusts in which specified beneficiaries continue to be interested . . . and those trusts in which there are no remaining specified beneficiaries." The judge was apparently persuaded that rule 1:07 was meant to apply in the latter cases (where the appointment "lies within the judge's discretion"), but not the former (where, depending on the circumstances, the judge may have less discretion as to whom to appoint).

[22]While it is undisputed that both Naughton and Harney were each "prayed for by name" by the then trustees of the Crabtree trusts, they were nonetheless appointed by the Probate Court pursuant to G. L. c. 203, § 5.

[23]Because of "the size of the fees paid by the trustees to themselves," the judge wished "to determine if their fee compensation was excessive." To this end, the judge's instructions to the guardian ad litem included a direction that the guardian ad litem review, among other things, "trustee compensation."

the trustees to submit a sworn itemized time and expense statement pursuant to G. L. c. 206, § 3.[24]

4. *Appointment of guardian ad litem.* We now turn to the remaining issue: whether it was proper for the judge to appoint a guardian ad litem. In so doing, the judge relied on both G. L. c. 206, § 24 (5),[25] and the court's "inherent" power.[26] In the circumstances, the judge's appointment of a guardian ad litem was proper.[27]

The judge had both the statutory authority to appoint a guardian ad litem, and authority to do so under the Probate and Family Court's rules. Pursuant to G. L. c. 206, § 24 (5), a guardian ad litem may be appointed if there are interested persons

---

[24]As the judge recognized, he also had an affirmative duty to decline to "approve compensation beyond the fair value of services rendered." See S.J.C. Rule 3:09, Canon 3 (B) (4), as appearing in 382 Mass. 809 (1981). Because of our resolution of the trustees' claim, we need not consider the guardian ad litem's argument that the judge had the authority, pursuant to Mass. R. Prof. C. 1.5, as amended, 432 Mass. 1301 (2001), to investigate, sua sponte, whether the trustees' fees were excessive.

[25]General Laws c. 206, § 24, provides, in pertinent part: "Upon application for the allowance of an account filed in probate court such notice as the court may order shall be given by publication . . . and by delivering or mailing by registered mail a copy of the citation to the attorney general if there are public charitable interests . . . [and] [f]or accounts of special administrators or in other kinds of fiduciary accounts or where the court deems special circumstances exist to such persons as the court may direct." General Laws c. 206, § 24 (5), further provides that "[e]xcept as otherwise provided herein, if there are other persons interested to whom such notice has not been given by delivery or registered mail, or if the interests of persons unborn, unascertained or legally incompetent to act in their own behalf are not represented except by the accountant, the court shall appoint [a] guardian ad litem . . . ."

[26]The judge also relied on his "broad statutory discretion" pursuant to "G. L. c. 206, § 34." This appears to be a typographical error. It is possible that the judge meant to refer to G. L. c. 206, § 3 (power to review accounts), or G. L. c. 206, § 30 (power to appoint guardian ad litem to represent contingent interests), or G. L. c. 206, § 24 (power to appoint guardian ad litem in various enumerated circumstances).

[27]In reaching our conclusion, we do not rely on the contents of a supplemental appendix containing the guardian ad litem's report filed in the Probate Court on April 9, 2002. The trustees oppose the guardian ad litem's motion to supplement the appellate record with this report on the grounds that (1) it is irrelevant to the appeal because it was issued after the judge made his decision on May 17, 2001, and (2) it would be prejudicial to the trustees, who have challenged the guardian ad litem's findings in the Probate Court.

who have not been notified or if the identity of all interested persons has not been ascertained. Here, it was not possible to identify or notify all potential beneficiaries of the trust. The section also provides that "where the court deems special circumstances exist," the court may order trustees to give notice of their accounts "to such persons as the court may direct." Here, the judge identified two special circumstances warranting notice to the guardian ad litem: "the size of the fees paid by the trustees to themselves" and "the fact that both accounts have beginning income balances and ending income balances in excess of $300,000 despite an apparent requirement of the trust that all income be used semi-annually." The trustees do not contest that these circumstances constitute "special circumstances."

Additionally, G. L. c. 206, § 30, provides for the appointment of a guardian ad litem to represent persons with contingent interests in trust funds,[28] and the judge had clear statutory authority to proceed as he did. Moreover, under Rule 5 of the Rules of the Probate and Family Court (2003), a judge may appoint a guardian ad litem to represent the interests of minors, legally incompetent persons, or persons unborn or unascertained, "if notice has been given on the pending matter."[29] In short, both statutory provisions and the rule expressly contemplate the appointment of a guardian ad litem in these circumstances.[30]

The trustees respond that it was error to appoint a guardian ad litem where, as here, the beneficiaries' interests had ef-

---

[28]General Laws c. 206, § 30, provides: "If there are contingent interests in such trust fund, whether the persons who may be entitled thereto are in being or not, or if any of the beneficiaries are minors, the court, before making an order or decree, shall cause such interests and minors to be properly represented by guardians ad litem or otherwise at its discretion."

[29]Rule 5 of the Rules of the Probate Court (2003) provides, in pertinent part, that "[i]n addition to making appointments of guardians ad litem in cases required by statute, whenever it shall appear that a minor, or other legally incompetent person or persons unborn or unascertained, are interested in any matter pending, a guardian ad litem for such minor, or other legally incompetent person or persons unborn or unascertained, may be appointed by the Court at its discretion if notice has been given on the pending matter. . . ."

[30]Because we conclude that the judge had the statutory authority and authority under the Probate and Family Court's Rules to appoint a guardian ad

fectively been represented by the Attorney General. See *Claflin, petitioner,* 336 Mass. 578, 583-584 (1958) ("No need here appears for the appointment of a guardian ad litem to duplicate . . . work . . .");[31] *Lynde* v. *Vose,* 326 Mass. 621, 623-624 (1951) ("To pay compensation to [the guardian ad litem] for services would be a waste of the money of the estate" because "[t]he guardian ad litem or next friend could represent no interest").[32] The trustees add that the appointment of a guardian ad litem usurps the Attorney General's authority to enforce the administration of public trusts pursuant to G. L. c. 12, § 8.[33]

The Attorney General's statutory duties do not displace the Probate and Family Court's "traditional supervisory control, codified at G. L. c. 206, § 1, over trustees it has appointed." *Matter of the Trust Under the Will of Fuller,* 418 Mass. 466, 483-484 (1994) (appointment of guardian ad litem uncontested, where guardian ad litem was to report on adequacy of settlement reached between Attorney General and trustees and where guardian ad litem's recommendations contradicted those of Attorney General).[34] See *Wilson, petitioner,* 372 Mass. 325, 330 (1977) (Attorney General's special role in connection with

litem, it is not necessary to consider whether he had the inherent authority to do so.

[31]As the judge recognized, *Claflin, petitioner,* 336 Mass. 578 (1958), is distinguishable. In that case we held that it would be improper to appoint a guardian ad litem under G. L. c. 206, § 24 (5), to represent beneficiaries in proceedings concerning an executor's account because the beneficiaries were already represented by trustees. We did not consider whether, as here, "special circumstances" existed such that a judge might order notice to be given to other persons "as the court may direct." See *id.* at 583 ("Whether a finding of 'special circumstances' under subparagraph [5] would be justified is not presented"). Moreover, in reaching our conclusion in that case, we explained that a guardian ad litem could later represent the relevant beneficiaries when the trustees rendered their own account. *Id.* at 584.

[32]*Lynde* v. *Vose,* 326 Mass. 621 (1951), is also distinguishable. In that case, the guardian ad litem had been appointed to represent the interests of the deceased. "Everyone interested [and living] was a party to the accounts." *Id.* at 623.

[33]General Laws c. 12, § 8, provides: "The attorney general shall enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof."

[34]The trustees seek to distinguish *Matter of the Trust Under the Will of Fuller,* 418 Mass. 466 (1994), on the ground that the will in that case expressly

public trusts does not "provide[] a basis for displacing the court's traditional discretion under G. L. c. 203, § 5, with respect to charitable trusts").[35] A judge is not bound by a settlement reached between acting trustees and the Attorney General, see *Matter of the Trust Under the Will of Fuller, supra,* or obligated to appoint a nominee proposed by the Attorney General, *Wilson, petitioner, supra.* In like fashion, a judge is not precluded from exercising his authority because the Attorney General has had the opportunity to object to an account, but has not done so. See *Quincy Trust Co.* v. *Taylor,* 317 Mass. 195, 198 (1944) ("Where a court has once taken jurisdiction and has become responsible to the public for the exercise of its judicial power so as to do justice, it is sometimes the right and even the duty of the court to act in some particular sua sponte"; it is "[e]specially appropriate" for the court to do so in "a case in which an appointee of the court to a position of trust is found unworthy or unsuitable").

Although the judge properly exercised his authority to appoint a guardian ad litem, we are cognizant that payment for the services of a guardian ad litem may in some cases substantially diminish funds available to carry out the purpose of a charitable trust. The Attorney General may have scrutinized the trustees' fifth and sixth accounts and concluded that their fees were not excessive and that the trustees had complied with the terms of the Crabtree trusts. But it may be, as the judge noted, that for reasons of resource allocation or otherwise, the Attorney General did not undertake a detailed review of the activities of these trustees, sufficient to satisfy the concerns of the judge. In the future, before a guardian ad litem is appointed to review the activities of the trustees of a charitable trust, the Attorney General should be informed of a judge's intent to make the appointment, and of his reasons for doing so. The Attorney General should be provided with a reasonable date by which to

directed the Probate Court to fill trustee vacancies as they arose. Here the judge effectively exercised the same authority under G. L. c. 203, § 5.

[35]*Weaver* v. *Wood,* 425 Mass. 270 (1997), and *Burbank* v. *Burbank,* 152 Mass. 254 (1890), on which the trustees rely, are inapposite. Those cases stand for the proposition that a private citizen cannot displace the Attorney General's authority to enforce a public trust. They do not circumscribe the Probate Court's "traditional supervisory" authority.

register an objection, if any, to such appointment. If the Attorney General does not respond within the designated period, the judge may conclude that there is, in fact, no opposition to the appointment of a guardian ad litem, and that the Attorney General has no objection to the expenditure of charitable trust resources to pay for such services.

5. *Conclusion.* We vacate the judge's order denying the petition to appoint Swift as the successor trustee and his order appointing Potter as trustee of the Crabtree trusts and remand that matter for further proceedings consistent with this opinion. We affirm the judge's appointment of the guardian ad litem and affirm his order directing the trustees to file sworn itemized time and expense statements.

*So ordered.*